**Iverson (Trey) CHAPMAN, III, Plaintiff,**

**v.**

**BIZET SHIPPING, S.A., Defendant.**

**Civil Action No. CV495–44.**

United States District Court,
S.D. Georgia,
Savannah Division.

Jan. 30, 1996.

James O. Wilson, Jr., Wilson & Sanders, Savannah, GA, George Lucas Lewis, Duffy, Feemster & Lewis, Savannah, GA, for Iverson Chapman, III.

Richard P. Salloum, Franke, Rainey & Salloum, Gulfport, MS, for Ryan Walsh, Inc.

George H. Chamlee, Chamlee, Dubus & Sipple, Savannah, GA, for Bizet Shipping, S.A.

## *ORDER*

ALAIMO, District Judge.

In this admiralty action, Plaintiff, Iverson (Trey) Chapman, III ("Chapman"), sues Defendant, Bizet Shipping, S.A., for injuries he sustained after falling from the upper 'tween deck of the Number Two Hold of the M/V *Agulhas,* one of Defendant's ships. The fall occurred when Chapman returned to the upper 'tween deck approximately two to three hours after the stevedores finished loading John Deere combines there. During the period between the loading of the combines and Chapman's return to the upper 'tween deck, the vessel's employees had opened the hatch and turned off the lights. Thus, when Chapman entered, he proceeded without noticing that the hatch was open, walked into the open hatch, and fell onto the lower hold.

This case is presently before the Court on Defendant's motion for summary judgment. After considering the pleadings, exhibits and depositions filed by the parties, the Court finds that there exists no genuine issue of material fact and, thus, summary judgment will be **GRANTED.**

## *FACTS*

On July 31, 1994, Chapman was injured on board the Number Two Hold of the M/V *Agulhas* (the *"Agulhas"*), a general cargo vessel owned and operated by Defendant,

Bizet Shipping, S.A. The *Agulhas* is a general cargo vessel with four cargo holds. Hold Number Two is subdivided horizontally into three cargo compartments: an upper 'tween deck, a lower 'tween deck, and a lower hold. Each 'tween deck is equipped with a metal hatch cover consisting of sections which fold back to provide an opening for cargo to be loaded into the compartments below.

During the period of July 29–31, 1994, Defendant retained Chapman's employer, Ryan–Walsh, Inc., to stevedore the *Agulhas*. By 1:40 P.M., on July 31, 1994, the stevedores finished loading the last John Deere combine onto the upper 'tween deck of the Number Two Hold. The stevedores then proceeded to load containers in another hold. By 4:00 P.M., the stevedores completed the loading of containers and commenced the paperwork. At this time, Chapman's supervisor, Ken Frost, realized that he was missing a set of ignition keys for a John Deere combine located on the upper 'tween deck of Hold Number Two. Consequently, he radioed Chapman to retrieve the keys.

Without notifying the ship's crew, Chapman entered the upper 'tween deck of the Number Two Hold to retrieve the keys. Unbeknownst to Chapman, in preparation for the ship's 5:00 P.M., o'clock sailing, the vessel's crew had opened the twenty foot aft end upper 'tween deck lid, closed the weather deck cover, and shut off the lights in the Number Two Hold. When Chapman entered the Hold's upper 'tween deck, he stepped where the aft end deck had been and fell through the opening onto the bottom of the vessel, thirty-five feet below, sustaining various injuries.

Chapman has filed suit against Defendant under 33 U.S.C. § 905(b), alleging that Defendant "negligently failed to remedy the situation by either turning on the lights to

the number two hold, closing the deck covers to the upper 'tween deck, or warning [Chapman] ... of the dangerous condition." (Pl['s] amended compl. at ¶ 18b). Defendant, in turn, has filed a motion for summary judgment, claiming that it owed Chapman no duty to avoid Chapman's injury or to warn him that the hatch was open.

## DISCUSSION

### I.  Standard for Summary Judgment

Summary judgment requires the movant to establish the absence of genuine issues of material fact, such that the movant is entitled to judgment as a matter of law. Fed. R.Civ.P. 56(c); *Lordmann Enterprises, Inc. v. Equicor, Inc.*, 32 F.3d 1529, 1532 (11th Cir.1994), *cert. denied,* —— U.S. ——, 116 S.Ct. 335, 133 L.Ed.2d 234 (1995). After the movant meets this burden, "the non-moving party must make a sufficient showing to establish the existence of each essential element to that party's case, and on which that party will bear the burden of proof at trial." *Howard v. BP Oil Co., Inc.*, 32 F.3d 520, 524 (11th Cir.1994) (citing *Celotex Corp. v. Catrett,* 477 U.S. 317, 324, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986)). The non-moving party to a summary judgment motion need make this showing only after the moving party has satisfied its burden. *Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir.1991). The court should consider the pleadings, depositions and affidavits in the case before reaching its decision, Fed. R.Civ.P. 56(c), and all reasonable inferences will be made in favor of the non-movant. *Griesel v. Hamlin,* 963 F.2d 338, 341 (11th Cir.1992).

### II.  Application of 33 U.S.C. § 905(b)

Title 33, § 905(b), of the United States Code, provides harbor workers with a remedy for injuries caused by the negligence of a vessel.[1] The current § 905(b) was enacted

---

1.  Section 905(b) provides in pertinent part:
    In the event of injury to a person covered under this chapter caused by the negligence of a vessel, then such person, or anyone otherwise entitled to recover damages by reason thereof, may bring an action against such vessel as a third party in accordance with the provisions of section 933 of this title, and the employer shall not be liable to the vessel for

such damages directly or indirectly and any agreements or warranties to the contrary shall be void. If such person was employed by the vessel to provide stevedoring services, no such action shall be permitted if the injury was caused by the negligence of persons engaged in providing stevedoring services to the vessel.... The liability of the vessel under this subsection shall not be based upon the warran-

as part of the 1972 amendments to the Long-shore and Harbor Workers' Compensation Act (LHWCA) in an effort to shield shipowners from strict liability for injuries suffered during loading activities, and to limit a harbor workers' recovery to instances in which the vessel owner or his crew was negligent. *Clark v. Bothelho Shipping Co.,* 784 F.2d 1563, 1565 (11th Cir.1986).

Interpreting § 905(b), the United States Supreme Court, in *Scindia Steam Nav. Co., Ltd. v. De Los Santos,* 451 U.S. 156, 101 S.Ct. 1614, 68 L.Ed.2d 1 (1981), articulated three differing standards of care to govern the relationship between the stevedore and the vessel owner. First, before the vessel is turned over to the stevedore, a vessel owner owes to the stevedore and its longshoremen the duty of due care under the circumstances, including having the ship and its equipment in such condition that an expert and experienced stevedore will be able, by the exercise of ordinary care, to carry on its cargo operations with reasonable safety. *Scindia Steam Nav. Co.,* 451 U.S. at 167, 101 S.Ct. at 1622 (citation omitted). A corollary to this duty is the requirement that the vessel owner provide warning of any hazards or hidden dangers not anticipated or expected by a reasonably competent stevedore. *Id.* (citation omitted). These duties are commonly referred to, respectively, as the "turnover duty" and the "turnover duty to warn." *Davis v. United States,* 827 F.Supp. 1576, 1579 n. 2 (S.D.Ga.1993).

The second *Scindia* duty, applicable once stevedoring operations begin, requires a shipowner to exercise reasonable care to prevent injuries to longshoremen in areas that remain under the "active control of the vessel." *Id.* This duty is frequently termed the "active operations duty." Thus, if the shipowner is actively involved in cargo operations, the ship owner may be held liable if it had constructive knowledge of a hazard and neglected to remedy the dangerous condition or to warn the stevedore about the potential danger. *Lampkin v. Liberia Athene Transport Co. Ltd.,* 823 F.2d 1497, 1501 (11th

Cir.1987) (*citing Scindia Steam Nav. Co.,* 451 U.S. at 168, 101 S.Ct. at 1622; *Turner v. Costa Line Cargo Services, Inc.,* 744 F.2d 505, 508 (5th Cir.1984)).

The third duty, commonly called the "duty to intervene," applies if the shipowner is not involved in the stevedoring operations. Under this duty, if the shipowner has actual knowledge of a perilous situation posing an unreasonable risk of harm, the shipowner must intervene and remedy the hazard. *Scindia,* 451 U.S. at 168, 101 S.Ct. at 1622. *See also Lampkin,* 823 F.2d at 1501. However, absent contract provision, positive law, or custom to the contrary, "the shipowner, within limits, is entitled to rely on the stevedore, and owes no duty to the longshoremen to inspect or supervise the cargo operations." *Scindia,* 451 U.S. at 172, 101 S.Ct. at 1624–25.

The parties disagree concerning which standard of care should govern this action. Chapman asserts that either a general negligence standard or the active operations duty should apply while Defendant urges application of the duty to intervene. As developed below, the Court finds no genuine issue of material fact to exist concerning any duty and, thus, summary judgment will be granted.

## A. Neither The Turnover Duty Nor The Turnover Duty To Warn Applies In This Case

The turnover duty and the turnover duty to warn relate to the condition of the ship upon commencement of stevedoring operations. *Howlett,* 512 U.S. 92, ——, 114 S.Ct. 2057, 2063, 129 L.Ed.2d 78 (1994) (*citing Scindia Steam Nav. Co.,* 451 U.S. at 167, 101 S.Ct. at 1622). Here, the accident occurred more than two hours after the completion of stevedoring operations on the upper 'tween deck of Hold Number Two. Thus, it only follows that the turnover duty and the turnover duty to warn do not apply.

Chapman argues, nonetheless, that the turnover duties may apply because cargo op-

---

ty of seaworthiness or a breach thereof at the time the injury occurred. The remedy provided in this subsection shall be exclusive of all other remedies against the vessel except remedies available under this chapter.
33 U.S.C. § 905(b) (1986).

erations began anew when Chapman entered the Number Two Hold. (Pl['s] Brief in Opposition to Defendant's Motion for Summary Judgment, at 23). The Court does not agree, for Chapman's retrieval of a set of ignition keys from the Number Two Hold does not constitute commencement of cargo operations.

Furthermore, Defendant did not violate its turnover duty. Here, all that was necessary to prevent Chapman's accident was for him to turn on the lights or carry a flashlight once he realized the lights were off in the Number Two Hold.[2] *See* Frost Deposition at 42–43 (recounting that flashlights were located in the stevedores' mobile trailer on the dock and that Chapman could have asked a duty mate to turn on the lights). Moreover, "[t]he duty to provide adequate lighting is imposed by law on the stevedore." *Landsem v. Isuzu Motors, Ltd.*, 534 F.Supp. 448, 451 (D.Ore.1982), *aff'd*, 711 F.2d 1064 (9th Cir.1983). *See also* 29 C.F.R. § 1918.92(3)(b) ("Employees shall not be permitted to enter dark holds, compartments, decks or other places without a flashlight or other suitable portable light"). Consequently, the stevedore, Ken Frost, should have provided Chapman with a light, and Chapman, as a stevedore trainee, should have known that he needed the lights turned on in the Number Two Hold. To subject Defendant to liability for an injury that either Frost or Chapman could have prevented "would threaten to upset the balance Congress was careful to strike in enacting the 1972 Amendments [to the LHWCA]." *Howlett*, 512 U.S. at ——, 114 S.Ct. at 2057.

## B. Defendant Did Not Violate The Active Operations Duty

The second duty, or active operations duty, applies only when the shipowner has constructive knowledge of the potential danger. *Lampkin*, 823 F.2d at 1501 (*citing*

*Scindia Steam Nav. Co.*, 451 U.S. at 168, 101 S.Ct. at 1622–23); *Turner*, 744 F.2d at 508. In the case *sub judice*, there is no way Defendant should have known that Chapman would re-enter the Number Two Hold more than two hours after completion of its loading, neglect to turn on a light and, consequently, fall down the open hatch.

Chapman argues to the contrary, citing deposition testimony that employees of the stevedore occasionally re-enter a hold after completion of stevedoring operations to retrieve items left behind. *See* Ranff Deposition at 31–32; Jennings Deposition at 40; Cicmir Deposition at 14–15; Bullock Deposition at 18; Cox Deposition at 39–41. Occasionally re-entering a hold to retrieve items left behind, however, does not convey constructive knowledge to the Defendant that Chapman would re-enter the hold without notifying the crew and without asking for a light. It is common for one to forget a purse at one's office, yet the janitors cannot be expected to refrain from mopping the floor or turning off the lights in anticipation that a worker will return to the office, not turn on a light, and slip on the wet floor.

Moreover, the cited deposition testimony illuminates that Defendant could not be expected to anticipate Chapman's return to the Number Two Hold, especially without his notifying the ship's crew or ensuring adequate lighting. For instance, in his deposition, Alvin Bullock describes an occurrence where one would go back into a hold as being "rare". Bullock Deposition at 18. Similarly, Ken Frost in his deposition recounts that before Chapman's accident, he never had to go back into a hatch to retrieve keys. Frost Deposition at 62. Additionally, Frost testified that in most cases he does not expect to return to a previously loaded hold. *Id.* at 61.

Moreover, the deponents stated that it is recommended that a longshoremen notify the ship's crew before entering a hold after ter-

---

**2.** On this point, Chapman cites the Deposition of Chapman's supervisor, Ken Frost, that the hold was sufficiently lit to observe the John Deere combine but not lit enough to see that the hatch was open. Frost Deposition at 49. Using Frost' deposition testimony, Chapman argues that it could not be stated as a matter of law that Chapman needed a flashlight when he entered the hold. (Pl['s] Brief in Opposition at 26). First, Chapman argues that Defendant could have avoided his injury by leaving the lights on, (Pl['s] Brief in Opposition at 24), then Chapman argues that the hold was not very dark. This is a peculiar anomaly, making Chapman's argument without merit.

mination of stevedoring operations. Jennings Deposition at 40; Bullock Deposition at 24. Such notification is recommended because the chief officer or the duty officer may lock the door while the stevedores are inside the hold. Jennings Deposition at 40. The chief mate of the *Agulhas* after Chapman's fall, Tomoslav Cicmir, stated in his deposition he had never known of a stevedore or longshoremen to go back into a closed hold without notifying him. Cicmir Deposition at 15.

Furthermore, deposition testimony also reveals that it is recommended for a stevedore to ask the ship's crew to turn on the lights before the stevedore re-enters a hold. Bullock Deposition at 25. In fact, the captain of the *Agulhas* at the time of Chapman's fall, Captain Helmut Ranff, stated in his deposition that when longshoremen go back into a hold, they say "Okay, mate, can you switch on the light, I forgot my jacket". Ranff Deposition at 32. Here, the answer to Chapman's plight was simply that he notify Defendant's crew that he was re-entering the Number Two Hold or that he needed a light. In either instance, the crew would most likely have informed Chapman of the danger. Instead, Chapman entered the Hold without any such disclosure, proceeded in the dark, and suffered a tragic fall. As a shipowner, Defendant had no duty to anticipate such carelessness. *Scindia Steam Nav. Co.,* 451 U.S. at 167, 101 S.Ct. at 1622 (citations omitted).

Finally, Chapman argues that this case is similar to *Hodges v. Evisea Maritime Co., S.A.,* 801 F.2d 678 (4th Cir.1986), *cert. denied,* 480 U.S. 933, 107 S.Ct. 1572, 94 L.Ed.2d 764 (1987), in which the Fourth Circuit affirmed the district court's denial of a directed verdict for the ship owner.[3] In *Hodges,* a longshoremen, while working in another hold, re-entered a previously loaded hold to obtain additional dunnage[4] and fell through an open hatch. As is the case here, the plaintiff in *Hodges* alleged that the vessel was negligent both in leaving the hatch open

and in failing to provide adequate lighting or other safety measures to prevent a fall. What differentiates *Hodges* from the case at bar, however, is that in *Hodges,* the plaintiff re-entered the previously loaded hold in search of dunnage in order to load cargo in another hold. *Hodges,* 801 F.2d at 684. Conversely, in this case, the stevedoring operations had already been completed when Chapman returned to Hold Number Two. Moreover, in *Hodges,* there was evidence that when more dunnage was needed, longshoremen would often go to other decks and holds to find some. *Id.* at 681. Here, the deponents testified that stevedores and longshoremen rarely returned to a previously loaded hold. Additionally, Chapman's stevedore, Ken Frost, recounted that he had never returned to a previously loaded hold to retrieve a set of keys. Thus, *Hodges* is unpersuasive and, as such, the Court finds as a matter of law that the ship owner did not breach the active operations duty.

## C. Defendant Did Not Breach The Duty To Intervene

The final *Scindia* duty, the duty to intervene, applies only when a ship owner has actual knowledge of a dangerous situation. *Lampkin,* 823 F.2d at 1501 (citations omitted). Here, it is undisputed that neither Chapman nor Frost informed Defendant of Chapman's intent to re-enter Hold Number Two. *See* Frost Deposition at 46; Chapman Deposition at 29–30. Accordingly, Defendant possessed no actual knowledge and, consequently, the third duty of intervention was not breached.

## D. Defendant Violated No General Duty Of Due Care

Chapman next argues that this is a unique situation in which none of the *Scindia* duties fit and that, consequently, Defendant should be held to a general duty of ordinary care. The Court, however, cannot find a genuine issue of material fact to exist concerning

---

3. While the *Hodges* court affirmed the district court's denial of a directed verdict, it reversed and remanded the case because the Fourth Circuit found the jury instructions to contain prejudicial error. *Hodges,* 801 F.2d at 687.

4. The term "dunnage" refers to mats, boughs, pieces of wood, or other loose materials placed under or among cargo to keep them secure and protected from the elements.

whether Defendant violated a general duty of due care since the Defendant had no knowledge, either actual or constructive, of the need to avoid Chapman's injury or to warn Chapman that the hatch was open and that the lights were obviously off in Hold Number Two.

### CONCLUSION

The Court recognizes that Chapman suffered a tragic fall aboard the *Agulhas.* Nonetheless, his claims against Defendant cannot survive summary judgment, for a claim against a ship owner may not go to a jury unless there are sufficient facts to conclude that there was a danger of which Defendant knew or should have known. *See Scindia,* 451 U.S. at 178, 101 S.Ct. at 1627–28. Here, Defendant neither knew or should have known the circumstances surrounding Chapman's re-entry into the upper 'tween deck of Hold Number Two. Accordingly, defendant's motion for summary judgment is **GRANTED.** The Clerk of Court is directed to enter the appropriate judgment.