[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 19-10533

_____

D.C. Docket No. 1:18-cv-21586-UU

ANTHONY TROUTMAN,

Plaintiff-Appellant,

versus

SEABOARD ATLANTIC LTD.,
a foreign corporation,
SEABOARD MARINE, LTD., INC.,
a foreign corporation, and
M/V SEABOARD ATLANTIC,
One 456' freight ship (IMO #9395563; Call Sign D5DC5),
in rem,

Defendants-Appellees.

_____

Appeal from the United States District Court
for the Southern District of Florida

_____

(May 13, 2020)

Before MARTIN, NEWSOM, and JULIE CARNES, Circuit Judges.

MARTIN, Circuit Judge:

Anthony Troutman was injured when he fell from a walkway on the upper deck of the ship where he was working as a longshoreman. He sued the ship and its owners (collectively, "Seaboard"), seeking to hold them liable under the Longshore and Harbor Workers' Compensation Act (the "LHWCA"), 33 U.S.C. § 901 et seq. Seaboard moved for summary judgment, arguing that the LHWCA does not permit Mr. Troutman's negligence claim. The District Court granted Seaboard's motion. It held that Mr. Troutman's suit was barred because, among other reasons, the hazardous condition that led to his injury was open and obvious.

With the benefit of oral argument, we affirm.

## I.

A. FACTUAL BACKGROUND

On April 22, 2016, Mr. Troutman was working for a stevedoring company named Eller ITO to secure containers being loaded onto the M/V Seaboard Atlantic (the "Vessel"). The Vessel is owned and chartered by Defendants Seaboard Atlantic Ltd. and Seaboard Marine Ltd. Prior to the incident, Mr. Troutman had been employed as a longshoreman for over 19 years.

This case centers around the cargo-loading process for two of the Vessel's bays, Bay 28 and Bay 32. Bay 28 is raised above Bay 32. An elevated walkway

2

runs along the bottom of Bay 28, above Bay 32.  Usually, cargo is loaded into the lower Bay 32 before Bay 28.  When this happens, the cargo fills Bay 32 and the tops of the containers are higher than the walkway above.  This alleviates the risk of falling off the walkway, since the person on the walkway is even with the tops of the cargo in Bay 32.  However, when Bay 32 is empty, there is a six-to-eight-foot drop from the walkway to the deck.

Before April 22, 2016, Mr. Troutman had worked on the Vessel over 20 times.  Sometimes when Mr. Troutman worked on the Vessel, the elevated walkway was protected by a rope fence.  Other times, Mr. Troutman and other longshoremen had to ask Seaboard to put up the rope fence.  When he worked on the Vessel, including on the day in question, Mr. Troutman worked as a lasher.  A lasher works to secure, and to release securing mechanisms for, cargo being loaded onto the ship.

On the day of the incident, the superintendent of Eller ITO, Gilberto Perez, decided to load Bay 28 first because of a delay in readying the containers that were to be loaded into Bay 32.  There was no rope fence protecting the walkway that day.  Mr. Troutman and Mr. Perez both knew that the walkway was unsafe without the rope fence.  Mr. Troutman also knew that he was not obligated to put himself in danger to perform his job, and that if a dangerous condition was present he was not required to work through it.  Mr. Troutman did not ask Seaboard to put up the

3

rope fence that day.  No party disputes that the walkway, in its exposed state, was an open and obvious hazard.

While Mr. Perez did direct that Bay 28 be loaded first, he did not instruct Mr. Troutman to start lashing the cargo on Bay 28.  Had Mr. Troutman asked, Mr. Perez would have told him not to start lashing the cargo on Bay 28 until Bay 32 was loaded.  Mr. Perez also testified that Eller ITO would have provided Mr. Troutman with safety equipment to prevent him from falling if he asked for it.

Nevertheless, Mr. Troutman began to lash the cargo loaded into Bay 28 before cargo had been loaded into Bay 32.  While walking on the elevated walkway, he tripped on loose lashing materials left there by another longshoreman. He lost his balance and fell to the deck below.  He was seriously injured and had to undergo surgery.

B. PROCEDURAL HISTORY

Mr. Troutman sued Seaboard, alleging it was negligent in breach of (1) the duty to turn over a safe vessel to the stevedore company; (2) the duty to intervene; and (3) the duty to exercise ordinary care to keep the vessel in reasonably safe condition.  Seaboard answered the complaint and the parties proceeded to discovery.  Following discovery, Seaboard moved for summary judgment.

The District Court granted summary judgment for Seaboard on all of Mr. Troutman's claims.  Relevant to this appeal, the court held that Mr. Troutman

4

could not succeed on his first claim—breach of what is known as the LHWCA's "turnover duty"—because the walkway was an open and obvious hazard which he could have avoided.  Mr. Troutman timely appealed.  His appeal challenges the grant of summary judgment on this basis alone.

## II.

"We review de novo the district court's grant of summary judgment, considering all of the evidence in the light most favorable to the nonmoving party." Nesbitt v. Candler County, 945 F.3d 1355, 1357 (11th Cir. 2020).  "Summary judgment is proper 'if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'"  Id. (quoting Fed. R. Civ. P. 56(a)).

## III.

This appeal requires us to address a question of first impression in this circuit: when, if ever, a negligence claim for breach of the shipowner's duty to turn over a vessel in safe condition properly lies where the plaintiff was injured by an open and obvious hazard.  We conclude that, generally, a shipowner does not breach this duty when the injurious hazard was open and obvious and could have been avoided by a reasonably competent stevedore.  Although this rule is not absolute, Mr. Troutman cannot show any exception to the rule that would deprive

Seaboard of an open-and-obvious defense here.  We therefore affirm the District Court's order granting summary judgment in favor of Seaboard.

## A.

The LHWCA "establishes a comprehensive federal workers' compensation program that provides longshoremen and their families with medical, disability, and survivor benefits for work-related injuries and death."  Howlett v. Birkdale Shipping Co., S.A., 512 U.S. 92, 96, 114 S. Ct. 2057, 2062 (1994).  The statute was amended in 1972 to permit a longshoreman to "seek damages in a third-party negligence action against the owner of the vessel on which he was injured."  Id.; see Longshoremen's and Harbor Workers' Compensation Act Amendments of 1972, Pub. L. No. 92-576, § 18(a), 86 Stat. 1251, 1263 (codified as amended at 33 U.S.C. § 905(b)).  It is this section of the LHWCA that governs Mr. Troutman's claim for relief.

Under § 905(b), a shipowner owes the longshoreman three general duties: "(1) a turnover duty, (2) a duty to exercise reasonable care in the areas of the ship under the active control of the vessel, and (3) a duty to intervene."  Kirksey v. Tonghai Mar., 535 F.3d 388, 391 (5th Cir. 2008) (citing, inter alia, Howlett, 512 U.S. at 98, 114 S. Ct. at 2063); see Scindia Steam Nav. Co. v. De Los Santos, 451 U.S. 156, 167–68, 101 S. Ct. 1614, 1622–23 (1981).  The 1972 amendments to the LHWCA also abrogated the shipowner's common-law defenses of assumption of

6

the risk and contributory negligence.  Kirsch v. Plovidba, 971 F.2d 1026, 1031 n.6 (3d Cir. 1992) (citing Scindia, 451 U.S. at 165 n.13, 101 S. Ct. at 1621 n.13).

A shipowner's turnover duty consists of two corresponding duties.  First, under the "duty of safe condition," the shipowner must exercise "ordinary care under the circumstances to have the ship and its equipment in such condition that an expert and experienced stevedore will be able by the exercise of reasonable care to carry on its cargo operations with reasonable safety to persons and property."[1] Bjaranson v. Botelho Shipping Corp., Manila, 873 F.2d 1204, 1207 (9th Cir. 1989) (quoting Scindia, 451 U.S. at 167, 101 S. Ct. at 1622); see Roach v. M/V Aqua Grace, 857 F.2d 1575, 1581 (11th Cir. 1988) ("[A] shipowner must turn over the ship and its equipment in a condition that permits a stevedore to do its work with reasonable safety . . . .").  Second, the shipowner has a "duty to warn" the longshoreman "of any hidden dangers of which [the shipowner] knows or should know."  Roach, 857 F.2d at 1581; see Howlett, 512 U.S. at 98–99, 114 S. Ct. at 2063.  The duty to warn is a "corollary" to the duty of safe condition.  Howlett, 512 U.S. at 98, 114 S. Ct. at 2063.

---

[1] Although the turnover duty of safe condition is framed in terms of danger to the stevedore—the longshoreman's employer—"the focus of the factual inquiry is frequently directed at [whether] experienced longshore workers" could complete their work with reasonable safety.  See Thomas v. Newton Int'l Enters., 42 F.3d 1266, 1270 n.4 (9th Cir. 1994)

B.

The District Court granted summary judgment for Seaboard on both aspects of the turnover duty.  The court held that Seaboard did not breach the duty of safe condition because "an expert and experienced stevedore could have loaded the Vessel with 'reasonable safety' by loading the lower deck first or . . . by staying off the walkway until <u>after</u> the lower deck was loaded."  Troutman v. Seaboard Atl. Ltd., No. 1:18-cv-21586-UU, 2019 WL 656259, at *4 (S.D. Fla. Jan. 8, 2019).  The court also held that Seaboard did not breach the duty to warn because "[t]he undisputed facts show that the hazard posed by the exposed walkway was open and obvious to the stevedore."  Id.  On appeal, Mr. Troutman argues the District Court erred by granting Seaboard an open-and-obvious defense to its turnover duty of safe condition.

Under the LHWCA, the stevedoring company and the longshoreman have primary responsibility for avoiding hazards they should have anticipated.  The LHWCA assumes the ability of "an expert and experienced stevedoring contractor, mindful of the dangers he should reasonably expect to encounter, . . . to carry on cargo operations with reasonable safety to persons and property."  Howlett, 512 U.S. at 98, 114 S. Ct. at 2063 (quotation marks omitted).  The shipowner does not have a duty "to turn over an absolutely safe vessel; the shipowner need only exercise reasonable care."  1 Thomas J. Schoenbaum, Admiralty & Maritime Law

§ 7:14, at 708 (6th ed. 2018).  Where a hazard exists, the question of negligence boils down to whether "an expert and experienced stevedore"—rather than an "unskilled person[]"—could safely avoid the hazard.  Bjaranson, 873 F.2d at 1208.  Generally, shipowners have "a rightful expectation" that a stevedoring company will "perform [its] task properly without supervision by the ship" and that the stevedore will "avoid exposing the longshoremen to unreasonable hazards."  Scindia, 451 U.S. at 170, 101 S. Ct. at 1623–24; see id. at 180 (Powell, J., concurring) (stating that, under the majority opinion in Scindia, the "primary burden . . . for avoiding injuries caused by obvious hazards" is placed "on the stevedore").

We read this precedent to establish a general rule that the open-and-obvious defense applies to breach of the turnover duty of safe condition.  This squares with the Supreme Court's pronouncements in Scindia and Howlett.  A longshoreman can only be said to have carried out his work with "reasonable competence" if he "identif[ied] and cope[d] with defects" of which he was aware.[2]  Howlett, 512 U.S. at 104, 114 S. Ct. at 2066; Scindia, 451 U.S. at 172, 101 S. Ct. at 1624.  Although

---

[2] To the extent that our pre-Howlett case law—in particular, Lemon v. Bank Lines, Ltd., 656 F.2d 110 (5th Cir. Sept. 1981)—suggests that a shipowner breaches the duty of safe condition by turning over a ship with an open and obvious hazard, we agree with the current-day Fifth Circuit that these cases have been "undermine[d]" by Howlett.  See Kirksey, 535 F.3d at 395–96; see also Bonner v. City of Prichard, 661 F.2d 1206, 1207 (11th Cir. 1981) (en banc) (adopting as binding precedent all decisions of the former Fifth Circuit handed down prior to the close of business on September 30, 1981).

the Supreme Court's articulation of what it means to act as a reasonable longshoreman came in the context of the duty to warn, see Howlett, 512 U.S. at 99–100, 101 S. Ct. at 2064, this reasoning applies with equal force to the shipowner's defense "against a claim based on the general failure to provide a safe ship based on defects in the stow." See Kirksey, 535 F.3d at 393–94; see also Howlett, 512 U.S. at 102, 114 S. Ct. at 2065 (applying principles "taken from [Scindia's] examination of the . . . duty to intervene" to analysis of the turnover duty). In contrast, Mr. Troutman's preferred rule—that a shipowner violates the duty of safe condition by turning over a ship with any hazard, no matter how obvious or avoidable—would violate several principles established in this area of law. For example, shipowners could no longer rely on the expertise and experience of the stevedoring company or longshoremen to deal with hazards that may arise. In addition, Mr. Troutman's rule would effectively require shipowners to turn over an absolutely safe vessel, a duty which the LHWCA does not impose. We thus conclude that the open and obvious nature of the exposed walkway is relevant to whether Seaboard violated its turnover duty of safe condition.

Mr. Troutman says the defense does not apply in this case because the walkway was inherently unsafe, comparing it to a hypothetical situation in which Seaboard allowed tigers to prowl the Vessel's deck. See Oral Argument Recording at 5:45–6:03. Mr. Troutman's analogy misses the mark because it would hardly be

10

reasonable for Seaboard to expect him to carry out his duties with safety if dangerous animals were roaming the ship.  Here, by contrast, it is undisputed that Mr. Troutman could have waited to use the walkway until after Bay 32 was loaded with cargo, thereby avoiding the hazard.  As a result, the general rule applies in this case.

Finally, Mr. Troutman says that affirming the District Court in his case cannot be squared with Congress's abrogation of the shipowner's defenses of assumption of the risk and contributory negligence.  This argument misunderstands whose negligence is at issue in this appeal.  We do not hold that Mr. Troutman is barred from recovery because he acted negligently by crossing the walkway.  Rather, we hold that, based on the undisputed facts of this case, Seaboard did not act negligently.  As we have explained, Seaboard was entitled to rely on the "expertise in cargo operations" of Mr. Troutman and his employer.  See Kirsch, 971 F.2d at 1031 n.6.  Because "an 'expert and experienced stevedore' acting with 'reasonable care'" would have been able to avoid the walkway, Seaboard was not negligent in allowing the walkway to exist in its exposed state.  See Morris v. Compagnie Mar. Des Chargeurs Reunis, S.A., 832 F.2d 67, 71 (5th Cir. 1987) (quoting Scindia, 451 U.S. at 168, 101 S. Ct. at 1622).

## IV.

The exposed walkway was an open and obvious hazard that Mr. Troutman could have avoided with the exercise of reasonable care.  For this reason, the District Court properly dismissed Mr. Troutman's claim for negligence under the LHWCA.

**AFFIRMED.**